PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 19-1191 thru 19-1232
_____

In re:  PENNEAST PIPELINE COMPANY, LLC

STATE OF NEW JERSEY; NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL PROTECTION; NEW JERSEY
STATE AGRICULTURE DEVELOPMENT COMMITTEE;
DELAWARE & RARITAN CANAL COMMISSION; NEW
JERSEY WATER SUPPLY AUTHORITY; NEW JERSEY
DEPARTMENT OF TRANSPORTATION; NEW
JERSEY DEPARTMENT OF THE TREASURY; NEW
JERSEY MOTOR VEHICLE COMMISSION,
Appellants
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 3-18-cv-01597, 3-18-cv-01603, 3-18-cv-01638,
3-18-cv-01643, 3-18-cv-01668, 3-18-cv-01669,
3-18-cv-01670 3-18-cv-01672, 3-18-cv-01673,
3-18-cv-01682, 3-18-cv-01684, 3-18-cv-01689,
3-18-cv-01699, 3-18-cv-01701, 3-18-cv-01709,
3-18-c-01721, 3-18-cv-01743, 3-18-cv-01754,
3-18-cv-01756, 3-18-cv-01774, 3-18-cv-01778,
3-18-cv-01801, 3-18-cv-01806,
3-18-cv-01845, 3-18-cv-01851, 3-18-cv-01855,

3-18-cv-01859, 3-18-cv-01863, 3-18-cv-01869,
3-18-cv-01874, 3-18-cv-01896, 3-18-cv-01905,
3-18-cv-01938, 3-18-cv-01942, 3-18-cv-01973,
3-18-cv-01974, 3-18-cv-01976, 3-18-cv-01990,
3-18-cv-01995, 3-18-cv-02001, 3-18-cv-02003 and
3-18-cv-02014)
District Judge:  Hon. Brian R. Martinotti
_____

Argued
June 10, 2019

Before:   JORDAN, BIBAS, and NYGAARD, *Circuit
Judges.*

(Filed: September 10, 2019)
_____

Mark A. Collier
Jeremy Feigenbaum   [ARGUED]
Office of Attorney General of New Jersey
Division of Criminal Justice
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ   08625
*Counsel for Appellants, State of New Jersey,*
*New Jersey Dept. of Environmental Protection,*
*New Jersey State Agriculture Dev. Committee,*
*New Jersey Motor Vehicle Commission,*
*Delaware & Raritan Canal Commission,*
*New Jersey Water Supply Authority,*
*New Jersey Department of Transportation,*
*New Jersey Department of Treasury,*

Jennifer Selendy
Selendy & Gay
1290 Avenue of the Americas – 17th Floor
New York, NY   10104
*Counsel for Amicus Appellant Niskanen Center*

Marueen T. Coghlan
James M. Graziano   [ARGUED]
Archer & Greiner
One Centennial Square
33 East Euclid Avenue
Haddonfield, NJ   08033
*Counsel for Appellee PennEast Pipeline Co, LLC*

Lela Hollabaugh
Bradley Arant Boult Cummings
1600 Division Street – Suite 700
Nashville, TN   37203

Anna M. Manasco
Bradley Arant Boult Cummings
1819 Fifth Avenue North
One Federal Place
Birmingham AL  35203
*Counsel for Amicus Appellees*
*Interstate Natural Gas Association of America,*
*American Petroleum Institute, Chamber of*
*Commerce of the United States of America,*
*National Association of Manufacturers*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

The Natural Gas Act ("NGA"), 15 U.S.C. §§ 717–717z, allows private gas companies to exercise the federal government's power to take property by eminent domain, provided certain jurisdictional requirements are met. This appeal calls on us to decide whether that delegation of power allows gas companies to hale unconsenting States into federal court to condemn State property interests.

PennEast Pipeline Company ("PennEast") is scheduled to build a pipeline through Pennsylvania and New Jersey. The company obtained federal approval for the project and promptly sued pursuant to the NGA to condemn and gain immediate access to properties along the pipeline route. Forty-two of those properties are owned, at least in part, by the State of New Jersey or various arms of the State. New Jersey sought dismissal of PennEast's condemnation suits for lack of jurisdiction, citing the Eleventh Amendment to the United States Constitution, and, separately, arguing that PennEast failed to satisfy the jurisdictional requirements of the NGA. Broadly speaking, the Eleventh Amendment recognizes that States enjoy sovereign immunity from suits by private parties in federal court. New Jersey has not consented to PennEast's condemnation suits, so those legal proceedings can go forward only if they are not barred by the State's immunity. The District Court held that they are not barred and granted PennEast orders of condemnation and preliminary injunctive relief for immediate access to the properties. New Jersey has appealed.

4

We will vacate because New Jersey's sovereign immunity has not been abrogated by the NGA, nor has there been – as PennEast argues – a delegation of the federal government's exemption from the State's sovereign immunity. The federal government's power of eminent domain and its power to hale sovereign States into federal court are separate and distinct. In the NGA, Congress has delegated the former. Whether the federal government can delegate its power to override a State's Eleventh Amendment immunity is, however, another matter entirely. While there is reason to doubt that, we need not answer that question definitively since, even if a delegation of that sort could properly be made, nothing in the text of the NGA suggests that Congress intended the statute to have such a result. PennEast's condemnation suits are thus barred by the State's Eleventh Amendment immunity. We will therefore vacate the District Court's order with respect to New Jersey's property interests and remand the matter for the dismissal of any claims against New Jersey.

## I.  BACKGROUND

The NGA authorizes private gas companies to acquire "necessary right[s]-of-way" for their pipelines "by the exercise of the right of eminent domain[,]" if three conditions are met. 15 U.S.C. § 717f(h).  First, the gas company seeking to condemn property must have obtained a Certificate of Public Convenience and Necessity (a "Certificate") from the Federal Energy Regulatory Commission ("FERC").  *Id*.  Second, it must show that it was unable to "acquire [the property] by contract" or "agree with the owner of property" about the amount to be paid.  *Id.*  Third and finally, the value of the property condemned must exceed $3,000.  *Id*.

5

In the fall of 2015, PennEast applied for a Certificate for its proposed 116-mile pipeline running from Luzerne County, Pennsylvania to Mercer County, New Jersey (the "project"). After a multi-year review,[1] FERC granted PennEast's application and issued a Certificate for the project, concluding that, so long as PennEast met certain conditions, "the public convenience and necessity require[d] approval of PennEast's proposal[.]"[2] (App. at 226.)

---

[1] That review unfolded as follows: In February 2015, FERC published notice in the *Federal Register* and mailed it to some 4,300 interested parties. FERC received over 6,000 written comments in response and heard from 250 speakers at three public meetings. The following summer, FERC issued a draft Environmental Impact Statement ("EIS") for the project. It also published notice in the *Federal Register* and mailed the draft EIS to over 4,280 interested parties. In response, FERC received more than 4,100 letters and heard from 420 (out of 670) attendees at six public meetings.

To address environmental and engineering concerns raised by the public, PennEast filed 33 route modifications. FERC then provided notice to newly affected landowners. The following spring, FERC published a final EIS in the *Federal Register*. That final EIS sought to address all substantive comments on the draft EIS. FERC concluded that nearly all New Jersey parcels "subject to types of conservation or open space protective easements will generally retain their conservation and open space characteristics[.]" (App. at 268.)

[2] Multiple parties, including New Jersey, challenged FERC's decision in the United States Court of Appeals for the District of Columbia. Petition for Review, *Delaware Riverkeeper Network v. FERC*, No. 18-1128 (D.C. Cir. filed

Certificate in hand, PennEast filed verified complaints in the United States District Court for the District of New Jersey, asking for orders of condemnation for 131 properties along the pipeline route, determinations of just compensation for those properties, and preliminary and permanent injunctive relief to gain immediate access to and possession of the properties to begin construction of its pipeline. Forty-two of the 131 property interests PennEast sought to condemn belong to New Jersey or arms of the State (collectively, the "State" or "New Jersey").[3] The State holds possessory interests in two of the properties and non-possessory interests – most often,

---

May 9, 2018). That petition remains pending. Several property owners also petitioned FERC for rehearing. Those petitions were all "rejected, dismissed, or denied[.]" (App. at 31.)

[3] This appeal was filed on behalf of the State of New Jersey, the New Jersey Department of Environmental Protection ("NJDEP"), the State Agriculture Development Committee ("SADC"), the Delaware & Raritan Canal Commission ("DRCC"), the New Jersey Department of the Treasury, the New Jersey Department of Transportation, the New Jersey Water Supply Authority, and the New Jersey Motor Vehicle Commission. It is undisputed that those various entities are arms of the State, and PennEast does not suggest that any of those entities should have anything less than Eleventh Amendment immunity to the same extent as the State of New Jersey.

easements requiring that the land be preserved for recreational, conservation, or agricultural use – in the rest.[4]

After PennEast filed its complaints, the District Court ordered the affected property owners to show cause why the Court should not grant the relief sought.[5] New Jersey filed a

---

[4] New Jersey owns those property interests as part its attempt to preserve farmland and open space in the State. *Cf.* N.J. Const. art. VIII, § 2 ¶¶ 6-7 (setting aside tax dollars for open space and farmland preservation). For decades now, the State has operated preservation programs aimed at preserving such land. For example, NJDEP's "Green Acres" program authorizes the State to purchase, and help local governments purchase, land for recreation and conservation. N.J. Stat. Ann. §§ 13:8A-1 to -56. New Jersey's Agriculture Retention and Development Act also empowers the SADC to preserve farmland by buying such land in fee simple or by buying development easements to preserve the land for agricultural uses. *Id.* §§ 4:1C-11 to -48. The State also owns and maintains easements along the Delaware Canal through DRCC to protect the State's water quality and vegetation. *Id.* §§ 13:13A-1 to -15; N.J. Admin. Code § 7:45-9.3.

The State has spent over a billion dollars on its preservation efforts. As of 2017, New Jersey had "helped to preserve over 650,000 acres of land[,]" and the "SADC and its partners had preserved over 2,500 farms and over 200,000 acres of farmland." (Opening Br. at 6 (citing App. at 94, 108).)

[5] The defendants include the State, as well as various townships, property trusts, utility companies, and individual property owners.

8

brief invoking its Eleventh Amendment immunity and arguing for dismissal of the complaints against it. It also argued that PennEast had failed to satisfy the jurisdictional requirements of the NGA by not attempting to contract with the State for its property interests.

After hearings on the show-cause order,[6] the District Court granted PennEast's application for orders of condemnation and for preliminary injunctive relief. At the outset, the Court rejected New Jersey's assertion of Eleventh Amendment immunity. It found that "PennEast ha[d] been vested with the federal government's eminent domain powers and stands in the shoes of the sovereign[,]" making Eleventh Amendment immunity inapplicable. (App. at 33.) The Court reasoned that, because "the NGA expressly allows 'any holder of a certificate of public convenience and necessity'" to condemn property, PennEast could do so here – even for property owned by the State. (App. at 33 (quoting 15 U.S.C. § 717f(h)).)

Next, the Court held that PennEast met the three requirements of the NGA, entitling it to exercise the federal government's eminent domain power. First, it found that PennEast holds a valid Certificate for the project. Next, it

---

[6] The Court held three hearings to accommodate the large number of defendants involved. Each hearing "generally proceeded the same way: First, PennEast was permitted to address the Court, followed by [property owners] represented by counsel. Next, any property owner in attendance was permitted to address the Court, giving first priority to any party who had filed an opposition. PennEast was permitted to respond." (App. at 29.)

9

concluded that PennEast had been unable to "acquire by contract, or [was] unable to agree with the owner of property to the compensation to be paid for" the affected properties. (App. at 48 (alteration in original) (quoting 15 U.S.C. § 717f(h)).) On that point, the Court rejected the State's contention that PennEast had to negotiate with the holders of all property interests, including easement holders. In the District Court's view, § 717f(h) refers only to the "*owner* of [the] property[,]" meaning the owner of the possessory interest. (App. at 48 n.49.) Finally, the Court found that the statute's property value requirement was satisfied because PennEast had extended offers exceeding $3,000 for each property. The Court thus granted PennEast's request for orders of commendation.

The District Court went on to hold that PennEast had satisfied the familiar four-factor test for preliminary injunctive relief. To obtain a preliminary injunction, the movant must show "1) that there is reasonable probability of success on the merits, 2) that there will be irreparable harm to the movant in the absence of relief, 3) that granting the injunction will not result in greater harm to the nonmoving party, and 4) that the public interest favors granting the injunction." *Transcon. Gas Pipe Line Co. v. Conestoga Twp.*, 907 F.3d 725, 732 (3d Cir. 2018). As to the first factor, the Court said that PennEast had already effectively succeeded on the merits, given that "the Court ha[d] found PennEast satisfied the elements of § 717f(h) and is therefore entitled to condemnation orders." (App. at 50.) As to the second factor, the Court found that, without an injunction, PennEast would suffer irreparable harm in the form of non-recoupable financial losses and construction delays. For the third factor, the Court noted that, while it had "carefully considered a wide range of arguments from Defendants regarding the harm PennEast's possession will cause," the

10

property owners would not be harmed "by the Court granting immediate possession" because they would receive just compensation. (App. at 53, 55.) Lastly, the Court was persuaded, especially in light of FERC's conclusion about public necessity, that the project is in the public interest. Having found all four factors weighed in favor of granting a preliminary injunction, the Court ordered that relief.[7] It then appointed five individuals to serve as special masters and condemnation commissioners to determine just compensation awards.

New Jersey moved for reconsideration of the District Court's denial of sovereign immunity and sought a stay of the District Court's order to prevent PennEast from taking immediate possession of the State's properties. As described more fully herein, *see infra* Part III–B.1., it argued that, based on the Supreme Court's decision in *Blatchford v. Native Village of Noatak*, 501 U.S. 775 (1991), the United States lacks the constitutional authority to delegate to private entities like PennEast the capacity to sue a State. The District Court denied that motion, concluding that *Blatchford* does not apply to condemnation actions brought pursuant to the NGA.

The State timely appealed. It also moved to stay the District Court's order pending resolution of this appeal and to expedite our consideration of the dispute. We granted that

---

[7] In addition to allowing PennEast to take immediate possession of the properties, the Court ordered that the U.S. Marshals could investigate, arrest, imprison, or bring to Court any property owner who violated the Court's order.

11

motion in part, preventing construction of the pipeline and expediting the appeal.

## II.    JURISDICTION AND STANDARD OF REVIEW

New Jersey contests jurisdiction in these condemnation actions, asserting here, as it did in the District Court, its sovereign immunity.  For the reasons that follow, we agree with it that the District Court lacked subject matter jurisdiction over the suits insofar as they implicated the State's property interests.  We, however, have jurisdiction under 28 U.S.C. § 1291 to review the denial of New Jersey's claim of Eleventh Amendment immunity.  *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993); *see Cooper v. Se. Pa. Transp. Auth.*, 548 F.3d 296, 298 (3d Cir. 2008) ("An order denying Eleventh Amendment immunity is immediately appealable as a final order under the collateral order doctrine.").  And, pursuant to 28 U.S.C. § 1292(a)(1), we have jurisdiction to review the grant of an injunction.

We exercise plenary review over a claim of sovereign immunity.  *Karns v. Shanahan*, 879 F.3d 504, 512 (3d Cir. 2018).  We review the grant of a preliminary injunction for abuse of discretion but review de novo the legal conclusions underlying the grant.  *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007).

## III.    DISCUSSION

The Eleventh Amendment declares that:

The Judicial power of the United States shall not be construed to extend to any suit in law or

12

equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The States' immunity from suit in federal court, however, "neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S. 706, 713 (1999). Rather, that immunity is "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today[.]"[8] *Id.* The Eleventh Amendment thus embodies a "recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity." *Puerto Rico Aqueduct*, 506 U.S. at 146.

Because of that immunity, States are not "subject to suit in federal court unless" they have consented to suit, "either expressly or in the 'plan of the convention.'"[9] *Blatchford*, 501 U.S. at 779 (quoting *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 310 (1990)). As part of "the 'plan of the

---

[8] State sovereign immunity "includes both immunity from suit in federal court and immunity from liability[.]" *Lombardo v. Pa., Dep't of Pub. Welfare*, 540 F.3d 190, 193 (3d Cir. 2008). Immunity from suit in federal court is known by the shorthand "Eleventh Amendment immunity." *Id.* That is the only type of State sovereign immunity at issue here.

[9] That immunity extends to agents and instrumentalities of the State. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 83 (3d Cir. 2016).

[Constitutional] convention[,]'" the States consented to suit by the federal government in federal court. *Blatchford*, 501 U.S. at 779-82; *see United States v. Texas*, 143 U.S. 621, 641-46 (1892); *City of Newark v. United States*, 254 F.2d 93, 96 (3d Cir. 1958) ("The consent of states to suits by the United States is implied as inherent in the federal plan."). The federal government thus enjoys an exemption from the power of the States to fend off suit by virtue of their sovereign immunity, an exemption that private parties do not generally have.[10] *Alden*, 527 U.S. at 755.

New Jersey asserts that it is entitled to sovereign immunity from these condemnation suits. It argues that the federal government cannot delegate its exemption from state sovereign immunity to private parties like PennEast and that, even if it could, the NGA is not a clear and unequivocal delegation of that exemption. PennEast disagrees. The company argues that a delegation of the federal government's eminent domain power under the NGA necessarily includes the ability to sue the States and that concluding otherwise would frustrate the fundamental purpose of the NGA to facilitate interstate pipelines.

**A**

---

[10] Citizens can, however, file suit against a State's officers where the litigation seeks only prospective injunctive relief based on an ongoing constitutional violation. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989); *Ex parte Young*, 209 U.S. 123 (1908). No one suggests that that doctrine of *Ex parte Young* is applicable here.

In view of PennEast's argument, it is essential at the outset to distinguish between the two powers at issue here: the federal government's eminent domain power and its exemption from Eleventh Amendment immunity. Eminent domain is the power of a sovereign to condemn property for its own use. *Kohl v. United States*, 91 U.S. 367, 371, 373-74 (1875). The federal government can exercise that power to condemn State land in federal court. *United States v. Carmack*, 329 U.S. 230, 240 (1946). But its ability to do so is not due simply to "the supreme sovereign's right to condemn state land. Rather, it is because the federal government enjoys a special exemption from the Eleventh Amendment." *Sabine Pipe Line, LLC v. Orange Cty., Tex.*, 327 F.R.D. 131, 140 (E.D. Tex. 2017). Thus, the federal government's ability to condemn State land – what PennEast contends it is entitled to do by being vested with the federal government's eminent domain power – is, in fact, the function of two separate powers: the government's eminent domain power and its exemption from Eleventh Amendment immunity. A delegation of the former must not be confused for, or conflated with, a delegation of the latter. A private party is not endowed with all the rights of the United States by virtue of a delegation of the government's power of eminent domain.

PennEast tries to ignore that distinction, arguing that Congress intended for private gas companies to which the federal government's eminent domain power has been delegated under the NGA to be able to condemn State property. Focusing on Congress's intent to enable gas companies to build interstate gas pipelines, PennEast fails to adequately grapple with the constitutional impediment to allowing a private business to condemn State land: namely, Eleventh Amendment immunity.

15

That failure is a consequence of the easier road PennEast chooses, namely citing the NGA and asserting, in effect, that Congress must have meant for pipeline construction to go forward, regardless of the Eleventh Amendment. That approach has the advantage of avoiding the difficulty of facing up to what the law requires to overcome Eleventh Amendment immunity. As discussed below, *see infra* Part III–B.3., Congress cannot abrogate state sovereign immunity under the Commerce Clause, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59, 72-73 (1996), and because Congress enacted the NGA pursuant to that Clause, the statute cannot be a valid congressional abrogation of sovereign immunity. To maintain these suits, then, PennEast had to offer a different answer for why its suits do not offend New Jersey's sovereign immunity. But, as just noted, the only reason it gives – an argument of implied delegation of the federal government's Eleventh Amendment exemption under the NGA – ignores rather than confronts the distinction between the federal government's eminent domain power and its exemption from Eleventh Amendment immunity. Unfortunately for PennEast, that distinction is essential, and there are powerful reasons to doubt the delegability of the federal government's exemption from Eleventh Amendment immunity.

**B**

Three reasons prompt our doubt that the United States can delegate that exemption to private parties. First, there is simply no support in the caselaw for PennEast's "delegation" theory of sovereign immunity. Second, fundamental differences between suits brought by accountable federal agents and those brought by private parties militate against

16

concluding that the federal government can delegate to private parties its ability to sue the States. Finally, endorsing the delegation theory would undermine the careful limits established by the Supreme Court on the abrogation of State sovereign immunity.

**1**

Looking in more detail at the caselaw, it lends no credence to the notion that the United States can delegate the federal government's exemption from state sovereign immunity. In *Blatchford*, the Supreme Court dealt with this issue. In that case, Native American tribes sued an Alaskan official for money allegedly owed to them under a state revenue-sharing statute. *Blatchford*, 501 U.S. at 777-78. Relevant here, the tribes argued that their suit did not offend state sovereign immunity because Congress had delegated to the tribes the federal government's ability to sue the States. *See id.* at 783 (explaining the tribes' assertion that, in passing 28 U.S.C. § 1362, which grants district courts jurisdiction over suits brought by Indian tribes arising under federal law, Congress had "delegate[d]" the federal government's authority to sue on behalf of Indian tribes "back to [the] tribes themselves").

The Court rejected that argument, expressing its "doubt … that sovereign exemption *can* be delegated—even if one limits the permissibility of delegation … to persons on whose behalf the United States itself might sue." *Id.* at 785. The Court explained why: "[t]he consent, 'inherent in the convention,' to suit by the United States—at the instance and under the control of responsible federal officers—is not consent to suit by anyone whom the United States might

select[.]" *Id.* The delegation theory, the Court explained, was nothing more than "a creature of [the tribes'] own invention." *Id.* at 786.

PennEast would have us dismiss *Blatchford* as "so distinguishable" as to be "useless by analogy." (Answering Br. at 41.) As PennEast sees it, the statute at issue in *Blatchford* was a jurisdictional statute that did not confer any substantive rights on the tribes, while the NGA confers the substantive power of eminent domain on private parties. But the Supreme Court's statements in *Blatchford* had nothing to do with the jurisdictional nature of the statute at issue and everything to do with the Court's deep doubt about the "delegation" theory itself.

Courts of Appeals have been similarly skeptical that the federal government can delegate to private parties its exemption from state sovereign immunity – even when the private party seeks to assert the interests of the United States, rather than the party's own. The D.C. Circuit's decision in *U.S. ex rel. Long v. SCS Business & Technical Institute, Inc.*, 173 F.3d 870 (D.C. Cir. 1999), is a case in point. There, the court stated that "permitting a *qui tam* relator to sue a state in federal court based on the government's exemption from the Eleventh Amendment bar involves just the kind of delegation that *Blatchford* so plainly questioned." *Id.* at 882. That conclusion accords with others from our sister circuits. *See United States ex rel. Foulds v. Tex. Tech Univ.*, 171 F.3d 279, 294 (5th Cir. 1999) (holding, in the *qui tam* context, that "the United States cannot delegate to non-designated, private individuals its sovereign ability to evade the prohibitions of the Eleventh Amendment"); *see also Jachetta v. United States*, 653 F.3d 898, 912 (9th Cir. 2011) (rejecting argument that the federal

18

government could authorize a private plaintiff to sue on its behalf as "unpersuasive" based on *Blatchford*). *But cf. United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 50 (4th Cir. 1992) (concluding that "the United States is the real party in interest" in *qui tam* suits and therefore such suits are not barred by the States' Eleventh Amendment immunity).

While the Supreme Court and federal Courts of Appeals have not addressed the precise issue that we have here – whether condemnation actions under the NGA are barred by Eleventh Amendment immunity – the one reported district court decision to do so held that Eleventh Amendment immunity is indeed a bar. In *Sabine Pipe Line, LLC v. Orange, County, Texas*, the pipeline company plaintiff argued that, because the federal government could exercise its eminent domain power to condemn State property, there was "no reason to treat a delegation of the same authority any differently." 327 F.R.D. at 139. The court disagreed. It explained that, like PennEast's arguments, the plaintiff's "theory of the case erroneously assumes that by delegating one power [, that of eminent domain], the government necessarily also delegated the other [, the ability to sue the States]." *Id.* at 140. The court was careful not to conflate the two powers and, based on *Blatchford*, concluded that "a private party does not become the sovereign such that it enjoys all the rights held by the United States by virtue of Congress's delegation of eminent domain powers." *Id.* at 141."[11] *Id.*

---

[11] PennEast is, of course, at pains to distinguish *Sabine*. It notes that the property at issue in *Sabine* had been privately owned at the time of the project's approval and only later transferred to the State of Texas. Thus, it argues, FERC's

19

We are in full agreement. Quite simply, there is no authority for PennEast's delegation theory of sovereign immunity. Indeed, the caselaw strongly suggests that New Jersey is correct that the federal government cannot delegate to private parties its exemption from state sovereign immunity.

**2**

Non-delegability makes sense, since there are meaningful differences between suits brought by the United States, an accountable sovereign, and suits by private citizens. *Blatchford*, 501 U.S. at 785. Suits brought by the United States are "commenced and prosecuted … by those who are entrusted with the constitutional duty to 'take Care that the Laws be faithfully executed[.]'" *Alden*, 527 U.S. at 755 (quoting U.S. Const., art. II, § 3). Private parties face no similar obligation. Nor are they accountable in the way federal officials are. *See id.* at 756 ("Suits brought by the United States itself require the exercise of political responsibility for each suit prosecuted against a State, a control which is absent from a broad delegation to private persons to sue nonconsenting States.").

Those considerations are clearly in play in the eminent domain context. There, the condemning party controls the

predecessor was not aware that it was approving a project that implicated State-owned land and that the State opposed. Moreover, it asserts, the *Sabine* court did not consider the arguments pressed here. But those arguments are unresponsive to the fundamental concern: whether the federal government can delegate its immunity exemption at all.

timing of the condemnation actions, decides whether to seek immediate access to the land, and maintains control over the action through the just compensation phase, determining whether to settle and at what price. The incentives for the United States, a sovereign that acts under a duty to take care that the laws be faithfully executed and is accountable to the populace, may be very different than those faced by a private, for-profit entity like PennEast, especially in dealing with a sovereign State. In other words, the identity of the party filing the condemnation action is not insignificant.

**3**

There is, however, a way that Congress can subject the States to suits by private parties. It can abrogate the sovereign immunity of the States. The Supreme Court "ha[s] stressed, however, that abrogation of sovereign immunity upsets the fundamental constitutional balance between the Federal Government and the States, placing a considerable strain on the principles of federalism that inform Eleventh Amendment doctrine[.]" *Dellmuth v. Muth*, 491 U.S. 223, 227 (1989) (alterations, internal quotation marks, and citations omitted). Accordingly, the Court has held that Congress can abrogate the sovereign immunity of the States "only by making its intention [to do so] unmistakably clear in the language of the statute" in question.[12] *Id.* at 228 (quoting *Atascadero State Hosp. v.*

---

[12] The same kind of clarity is demanded for waivers of sovereign immunity. *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985) ("[W]e require an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment. As we said in *Edelman v. Jordan*, '[c]onstructive

*Scanlon*, 473 U.S. 234, 242 (1985)). "Unmistakable" clarity is a high bar, and one that must be cleared without resort to nontextual arguments. *See Atascadero*, 473 U.S. at 246 ("A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment. When Congress chooses to subject the States to federal jurisdiction, it must do so specifically."); *see also Dellmuth*, 491 U.S. at 230 ("If Congress' intention is 'unmistakably clear in the language of the statute,' recourse to legislative history will be unnecessary; if Congress' intention is not unmistakably clear, recourse to legislative history will be futile, because by definition the rule of *Atascadero* will not be met.").

Moreover, Congress may abrogate state sovereign immunity only pursuant to a valid exercise of federal power. *Seminole Tribe*, 517 U.S. at 59. Particularly relevant here, Congress cannot abrogate sovereign immunity under its Commerce Clause powers. *Id.* at 59, 72-73. Instead, the Supreme Court has recognized that Congress can abrogate sovereign immunity only when it acts pursuant to § 5 of the Fourteenth Amendment.[13] *See Fitzpatrick v. Bitzer*, 427 U.S.

---

consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here.'" (second alteration in original) (citation omitted)), *superseded in other respects by* Rehabilitation Act Amendments, 42 U.S.C. § 2000d–7.

[13] For a relatively short period of time, the Supreme Court held that Congress could abrogate state sovereign immunity pursuant to the Commerce Clause. *Pennsylvania v. Union Gas Co.* 491 U.S. 1, 13-15 (1989). But that decision

445, 456 (1976) (holding that Congress can abrogate state sovereign immunity pursuant to § 5); *cf. Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 362 (2006) (declining to decide whether Congress can abrogate state sovereign immunity pursuant to the Bankruptcy Clause of the Constitution).

What we take from those rules is that state sovereign immunity goes to the core of our national government's constitutional design and therefore must be carefully guarded. Yet accepting PennEast's delegation theory would dramatically undermine the careful limits the Supreme Court has placed on abrogation. Indeed, "[t]o assume that the United States possesses plenary power to do what it will with its Eleventh Amendment exemption [by delegation] is to acknowledge that Congress can make an end-run around the limits that that Amendment imposes on its legislative choices." *SCS Bus.*, 173 F.3d at 883. We are loath to endorse a never-before-recognized doctrine that would produce such a result.

**4**

None of PennEast's arguments for the delegability of the Eleventh Amendment exception are persuasive. PennEast contends that "[t]here simply is no interference with state sovereignty when the United States itself has found that an interstate infrastructure project is both necessary and in the public's interest"[14] and that New Jersey "faces no real 'harm'

---

was overruled. *Seminole Tribe*, 517 U.S. at 66; *see also infra note* 20.

[14] In support of that proposition, PennEast relies on *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508

… given FERC's plenary oversight over pipeline projects and their respective routes." (Answering Br. at 18-19.) And, the company says, if the State is aggrieved, it "has recourse against the federal government" by way of challenging FERC's decision to grant the Certificate. (Answering Br. at 22.) Those arguments miss the point. This case is not about whether the States have a chance to register their dissent or concerns about pipeline plans. It is about whether the federal government can delegate its ability to hale fellow sovereigns into federal court and force the States to respond. It is the "indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties" that New

---

(1941). There, according to PennEast, the Supreme Court held there was no Eleventh Amendment bar to a private party condemning State land because the dam project at issue had been authorized by Congress and so "there was 'no interference with the sovereignty of the state.'" The same reasoning applies here, it asserts, because the NGA authorizes PennEast to condemn property that FERC has found necessary to complete a project that is in the public interest.

That misreads *Guy*. In *Guy*, the State of Oklahoma sued to enjoin the construction of a congressionally authorized dam, as well as related condemnations. *Id.* at 511. While the respondents were private entities, federal government attorneys had instituted the condemnation actions. *Id.* at 511 n.2. And the United States, not the dam company, was going to "acquire title to the inundated land." *Id.* at 511. So while it is true that Oklahoma argued the dam would be a "'direct invasion and destruction' of the sovereign and proprietary rights of Oklahoma[,]" *id.* at 512, that was not because the State was being sued by private parties.

Jersey seeks to avoid. *Puerto Rico Aqueduct*, 506 U.S. at 146 (citation omitted). FERC's blessing of the project does not speak to that problem in any way.[15]

In the same vein, PennEast cites *qui tam* suits under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733,[16] as proof "that the federal government can delegate its authority to sue" the States, provided the parties act on the government's behalf and under its control, as PennEast says is the case here.

---

[15] Again, adopting PennEast's position that federal agency involvement is enough to conclude that the United States has delegated its ability to sue the States to a private entity would fundamentally erode the Eleventh Amendment and the rules regarding abrogation. If PennEast were correct, Congress could simply amend a statute pursuant to its Commerce Clause powers, give an agency some review responsibility, and thereby skirt any limit on Congress's ability to abrogate state sovereign immunity.

[16] The FCA authorizes private plaintiffs to sue "for the person and for the United States Government" against the alleged false claimant, "in the name of the Government." 31 U.S.C. § 3730(b)(1). The FCA places several conditions on those suits. Before suing, the private plaintiff must first notify the federal government and allow it to intervene. *Id.* §§ 3730(b)(2), (4). The government can then decide whether to pursue the claim itself or leave it to the individual to pursue on behalf of and in the name of the government. *Id.* § 3730(b)(4). At that point, the government can intervene in the suit only for "good cause." *Id.* § 3730(c)(3). But the private plaintiff also cannot dismiss the suit without the consent of the government. *Id.* § 3730(b)(1).

(Answering Br. at 36.) We disagree. To begin with, there is a split of authority on whether *qui tam* suits against States are barred by the Eleventh Amendment. *Compare, e.g.*, *United States ex rel. Milam*, 961 F.2d at 50 (allowing *qui tam* suits to proceed based on that court's view that the United States was the "real party in interest"), *with United States ex rel. Foulds*, 171 F.3d at 289, 292-94 (concluding that *qui tam* suits are barred by the Eleventh Amendment, based on *Blatchford*). While we take no position on that question now, even the cases upholding *qui tam* suits are of little help to PennEast. As New Jersey highlights, courts upheld suits under the FCA because the suits are brought "in the name of the Government" based on "false claims submitted to the government"; the federal government receives most of any amount recovered; it can intervene in the suit after it has begun; and the case cannot be settled or voluntarily dismissed without the government's consent. *United States ex rel. Milam*, 961 F.2d at 48-49 (citations omitted). None of that is true here: PennEast filed suit in its own name; PennEast will gain title to the land; there is no special statutory mechanism for the federal government to intervene in NGA condemnation actions; and PennEast maintains sole control over the suits. Most importantly, while the Supreme Court has "express[ed] no view on the question whether an action in federal court by a *qui tam* relator against a State would run afoul of the Eleventh Amendment," it has noted "there is 'a serious doubt' on that score." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000) (quoting *Ashwander v. TVA*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring)). Accordingly, the attempted analogy to *qui tam* suits falls far short of supporting PennEast's broad delegation theory.

26

PennEast is also incorrect that New Jersey's sovereign immunity simply "does not apply" in condemnation actions because they are *in rem* proceedings. (Answering Br. at 48.) The cases PennEast cites are confined – by their terms – to the specialized areas of bankruptcy and admiralty law. *See Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 445, 450 (2004) (concluding "a bankruptcy court's discharge of a student loan debt does not implicate a State's Eleventh Amendment immunity" because "the bankruptcy court's jurisdiction is premised on the res, not on the persona"); *California v. Deep Sea Res.*, 523 U.S. 491, 506 (1998) ("Although the Eleventh Amendment bars federal jurisdiction over general title disputes relating to state property interests, it does not necessarily follow that it applies to *in rem admiralty actions*, or that in such actions, federal courts may not exercise jurisdiction over property that the State *does not actually possess*." (emphases added)).[17] In contrast, the Supreme Court has made clear that the general rule is "[a] federal court cannot summon a State before it in a private action seeking to divest

---

[17] Moreover, States can assert their sovereign immunity in *in rem* admiralty proceedings, when the State possesses the res. *See Aqua Log, Inc. v. Georgia*, 594 F.3d 1330, 1334 (11th Cir. 2010) ("In *Deep Sea Research*, the Supreme Court reaffirmed the vitality of a series of cases dating back to the nineteenth century that hold a government can assert sovereign immunity in an *in rem* admiralty proceeding only when it is in possession of the res."). Here, of course, New Jersey possesses the property interests PennEast is seeking to condemn, so PennEast's argument is wholly unsupported.

27

the State of a property interest."[18] *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 289 (1997) (O'Connor, J., concurring). And the Supreme Court has consistently recognized that sovereigns can assert their immunity in *in rem* proceedings in which they own property. *Cf. Minnesota v. United States*, 305 U.S. 382, 386-87 (1939); *see also Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 699 (1982)

---

[18] PennEast argues that *Coeur d'Alene*, in which the Supreme Court held that a tribe's suit was barred by Eleventh Amendment immunity, does not show New Jersey is entitled to sovereign immunity because, in *Coeur d'Alene*, a state forum was available, the tribe was effectively seeking a "determination that the lands in question are not even within the regulatory jurisdiction of the State[,]" and submerged lands were at issue, a "unique" type of property under the law. (Answering Br. at 39 (quoting *Coeur d'Alene*, 521 U.S. at 282-83).) But those facts were only important for determining whether the tribe could bring suit pursuant to *Ex parte Young*, 209 U.S. at 155-56, which allows suits against state officials for injunctive relief. *Coeur d'Alene*, 521 U.S. at 281-83. The facts PennEast relies on had nothing to do with the general rule that the Eleventh Amendment applies when a State's property is at issue. *See Coeur d'Alene*, 521 U.S. at 281-82 ("It is common ground between the parties … that the Tribe could not maintain a quiet title suit against Idaho in federal court, absent the State's consent. The Eleventh Amendment would bar it.); *id.* at 289 ("The Tribe could not maintain a quiet title action in federal court without the State's consent, and for good reason: A federal court cannot summon a State before it in a private action seeking to divest the State of a property interest." (O'Connor, J., concurring)).

(plurality). New Jersey's sovereign immunity remains very much a concern in these *in rem* proceedings.[19]

---

[19] The only support for PennEast's position is *Islander East Pipeline Co. v. Algonquin Gas Transmission Co.*, 102 FERC ¶ 61054 (Jan. 17, 2003). In that final order, FERC concluded that the Eleventh Amendment "has no significance" for condemnation actions under the NGA because those suits are not "suit[s] in law or equity" against a State. *Id.* ¶ 61132. FERC's conclusion is an outlier and one that was reached with little, if any, analysis. More importantly, it is flatly wrong. FERC did not deign to explain what type of suit a condemnation action under the NGA is, if not a suit at law or equity. And the drafters of the Eleventh Amendment evidentially meant that term to be all-encompassing. *See Alden*, 527 U.S. at 721 ("Each House spent but a single day discussing the [Eleventh] Amendment, and the vote in each House was close to unanimous. All attempts to weaken the Amendment were defeated." (citations omitted)); *see also id.* at 722 ("The text and history of the Eleventh Amendment also suggest that Congress acted not to change but to restore the original constitutional design. Although earlier drafts of the Amendment had been phrased as express limits on the judicial power granted in Article III, the adopted text addressed the proper interpretation of that provision of the original Constitution[.]" (citations omitted)). In any event, condemnation suits have historically been understood as suits in law. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999) ("Just compensation [for a taking] … differs from equitable restitution…. As its name suggests, … just compensation is, like ordinary money damages, a compensatory remedy."); *Kohl*, 91 U.S. at 376 ("The right of eminent domain always was a right at common

**C**

Like the Supreme Court, our sister circuits, and the district court in *Sabine*, we are thus left in deep doubt that the United States can delegate its exemption from state sovereign immunity to private parties. But we need not definitively resolve that question today because, even accepting the "strange notion" that the federal government can delegate its exemption from Eleventh Amendment immunity, *Blatchford*, 501 U.S. at 786, nothing in the NGA indicates that Congress intended to do so. "As a first inquiry, we must avoid deciding a constitutional question if the case may be disposed of on some other basis." *Doe v. Pa. Bd. of Prob. & Parole*, 513 F.3d 95, 102 (3d Cir. 2008).

Recall that congressional intent to abrogate state sovereign immunity must be "unmistakably clear in the language of the statute." *Blatchford*, 501 U.S. at 786 (citation omitted); *see also United States v. Carmack*, 329 U.S. 230, 243 n.13 (1946) (explaining that statutes granting eminent domain power to non-governmental actors "do not include sovereign powers greater than those expressed or necessarily implied, especially against others exercising equal or greater public powers" and that "[i]n such cases the absence of an express grant of superiority over conflicting public uses reflects an absence of such superiority"). If delegation were a possibility, one would think some similar clarity would be in order. But the NGA does not even mention the Eleventh Amendment or state sovereign immunity. Nor does it reference "delegating" the federal government's ability to sue the States. It does not

---

law."). We are therefore unpersuaded by FERC's decision and owe it no deference.

30

refer to the States at all. If Congress had intended to delegate the federal government's exemption from sovereign immunity, it would certainly have spoken much more clearly. *Cf. Dellmuth*, 491 U.S. at 232 (rejecting the argument that a statute's frequent references to the States were clear enough to abrogate sovereign immunity); *Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208, 223 (3d Cir. 2018) (explaining courts must "assume that Congress does not intend to pass unconstitutional laws" given the "cardinal principle of statutory interpretation that when an Act of Congress raises a serious doubt as to its constitutionality, courts will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided" (citation and alterations omitted)). And while the NGA confers jurisdiction where the amount in controversy exceeds $3,000, "it would be quite a leap" to infer from that "grant of jurisdiction the delegation of the federal government's exemption from the Eleventh Amendment." *Sabine*, 327 F.R.D. at 141. In short, nothing in the text of the statute even "remotely impl[ies] delegation[.]" *Blatchford*, 501 U.S. at 786.

Despite that, PennEast contends that, because the NGA does not differentiate between privately held and State-owned property, Congress intended to make *all* property subject to a Certificate-holder's right of eminent domain. The company also argues that the NGA is best understood in light of its legislative history and purpose, as well as by comparing the NGA to two other condemnation statues, both of which include explicit carve-outs for property owned by States. Whatever the force of those arguments – and it is slight, at best[20] – it does not

---

[20] As for the legislative history, it demonstrates that Congress intended to give gas companies the federal eminent

31

domain power. *See* S. Rep. No. 80-429, at 2-3 (1947) (discussing need to grant natural gas companies the right of eminent domain to ensure the construction of interstate pipelines). But it says nothing about Congress's intent to allow suits against the States.

And, as one of the amici, the Niskanen Center, argues, the history of Eleventh Amendment jurisprudence explains the difference in language between the NGA and the two statutes PennEast cites, the Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.*, and the statute authorizing Amtrak to exercise eminent domain over property necessary to build rail lines, 49 U.S.C. § 24311(a) (the "Amtrak Act"). When Congress passed the NGA and 15 U.S.C. § 717f(h), in 1938 and 1947, respectively, Congress "was legislating under the consensus that it could not abrogate states' Eleventh Amendment immunity pursuant to the Commerce Clause[.]" (Niskanen Br. at 14.) Because of that, there was no reason to include a carve-out for State-owned property. *See Union Gas*, 491 U.S. at 35 (Scalia, J., concurring in part and dissenting in part) ("It is impossible to say how many extant statutes would have included an explicit preclusion of suits against States if it had not been thought that such suits were automatically barred.").

Then came *Union Gas*, which permitted Congress to abrogate state sovereign immunity pursuant to its Commerce powers. *Id.* at 23 (plurality opinion). Seven years later, however, in *Seminole Tribe*, the Supreme Court overruled *Union Gas* and affirmed that Congress can only abrogate state sovereign immunity pursuant to the Fourteenth Amendment. *Seminole Tribe*, 517 U.S. at 65-66.

The FPA and Amtrak Act, however, "were enacted or amended during [the] eight-year period" between *Union Gas*

32

change the text of the statute. In the absence of any indication in the text of the statute that Congress intended to delegate the federal government's exemption from state sovereign immunity to private gas companies, we will not assume or infer such an intent. That is to say, we will not assume that Congress intended – by its silence – to upend a fundamental aspect of our constitutional design. *Cf. King v. Burwell*, 135 S. Ct. 2480, 2494 (2018) (rejecting a proposed interpretation of a statutory scheme because "[i]t is implausible that Congress meant the Act to operate in this manner"); *Guerrero-Sanchez*, 905 F.3d at 223 (explaining doctrine of constitutional avoidance). Accordingly, we hold that the NGA does not constitute a delegation to private parties of the federal government's exemption from Eleventh Amendment immunity.[21]

## D

PennEast warns that our holding today will give States unconstrained veto power over interstate pipelines, causing the industry and interstate gas pipelines to grind to a halt – the precise outcome Congress sought to avoid in enacting the NGA. We are not insensitive to those concerns and recognize that our holding may disrupt how the natural gas industry,

---

and *Seminole Tribe*, a time during which Congress was careful to address state sovereign immunity when drafting legislation. (Reply Br. at 12.) Given that context, the lack of similar language in the NGA is not as persuasive of PennEast's point as the company would like.

[21] Because we hold that New Jersey is entitled to Eleventh Amendment immunity from these suits, we need not address the State's alternative arguments.

which has used the NGA to construct interstate pipelines over State-owned land for the past eighty years, operates.

But our holding should not be misunderstood. Interstate gas pipelines can still proceed. New Jersey is in effect asking for an accountable federal official to file the necessary condemnation actions and then transfer the property to the natural gas company. *Cf. Kelo v. City of New London*, 545 U.S. 469, 480 (2005) (discussing how broadly the Supreme Court has defined "public purpose" under the Takings Clause). Whether, from a policy standpoint, that is or is not the best solution to the practical problem PennEast points to is not our call to make. We simply note that there is a work-around.

PennEast protests that, because the NGA does not provide for FERC or the federal government to condemn the necessary properties, the federal government cannot do so. But one has to *have* a power to be able to delegate it, so it seems odd to say that the federal government lacks the power to condemn state property for the construction and operation of interstate gas pipelines under the NGA. In any event, even if the federal government needs a different statutory authorization to condemn property for pipelines, that is an issue for Congress, not a reason to disregard sovereign immunity. To be sure, such a change would alter how the natural gas industry has operated for some time. But that is what the Eleventh Amendment demands.

## IV. CONCLUSION

Accordingly, we will vacate the District Court's order insofar as it condemns New Jersey's property interests and grants preliminary injunctive relief with respect to those

interests, and we will remand for dismissal of claims against the State.